Drummond, O. J.
In the fall of 1877, Yan Camp & Son were engaged in business at Indianapolis, in buying and selling apples and other produce, and in the manufacture and putting up of meats, fruits, etc. They had a storehouse at Indianapolis, where they kept articles which they wished to hold for better prices. At that time they applied to the bank for a loan of $2,000. The bank agreed to make the loan upon the execution of a note by the bankrupts, with certain sureties, and on the condition that they would convert their storehouse into a public warehouse of class “B,” by taking out a permit therefor under the statute, and would place the 800 barrels of apples, for the purchase of which they made the loan, in the warehouse, issuing warehouse receipts therefor *175 to a certain person, by name, the son of one of the firm, to be by him indorsed, and left with the bank as collateral security. This arrangement was carried out, the note executed, with sureties, the apples purchased and placed in the warehouse, for which a permit was taken out, the store being made a warehouse of class “B,” and the receipts issued and indorsed to the bank, as provided in the agreement. The son, to whom the receipts were given, had no interest in the-property, and had no business connection with the firm in any way. During the time that these transactions occurred the bankrupts kept their general account with the bank, and deposited and drew out money as they received or needed the same; and the note, discounted by the bank, was placed as a credit to their general account.
In January, 1878, Yan Camp & Son were adjudged bankrupts by the district court for this district, and the apples, covered by the receipts referred to, together with the other property, came into the hands of the assignee, and were sold by the order of the district court, the proceeds being permitted to remain in the hands of the assignee, subject to the same rights which existed against the property itself. Upon application by the bank to the district court, requesting that a lien might be declared in its favor on the fund arising from the sale of the apples, the assignee was ordered to pay the amount of the note out of the fund in his hands, on the ground that the bank had an absolute lien upon the property for which it held the warehouse receipts. That order the assignee asks to have reviewed by this court, and the question before the court is whether the bank had a priority of lien over the general creditors, as the district court adjudged.
There is nothing in the statement of the case to indicate that the bankrupts used their warehouse, as a warehouse under the statute, in any other way than for the purpose specially intended by the bank. It does not appear that th9 property of any other person than that of the bankrupts was stored in the warehouses. The case, then, was one where the bankrupts having purchased and taken possesssion of prop *176 erty stored it in their warehouse, for which a permit had been obtained, as class “B,” and issued receipts for the same, and transferred them, through a third person to whom they were issued, to the bank as collateral security for the loan made.
By the act of March 9,1875, (1 Davis, 1876, p. 927,) public warehouses are divided into two classes, “A” and “B.” Any person or incorporation may keep a public warehouse by obtaining a permit from the auditor of the county in which the warehouse is situated. The warehouse shall continue subject to the provisions of the law until the owners shall file a notice in the auditor’s office, renouncing the character of public warehousemen.
Class “A“ embraces warehouses in which grain is stored in bulk, and that of different owners mixed together. Class “B” embraces warehouses where property of my kind is stored for a consideration.
Most of the sections following the first and second, to which reference has been particularly made above, refer to the storing of grain in warehouses of class “A. ” The .fourteenth section of the act declares that receipts for property stored in my class of warehouses shall be negotiable and transferable by the indorsement of the warehouse receipts which are to be given for the property stored, and the indorsement of the party to whom the receipt is given shall constitute a valid transfer of the property. The indorsement is to be deemed a warranty that the indorsee has a good title and lawful authority to sell the property named in the receipt.
All warehouse receipts for property stored in warehouses of class “B” are to distinctly state on their face the brand or distinguishing mcurk of the property.
The fourth section of the act provides specifically for the issue of a receipt for property stored in warehouses of class "A.” There seems to be no such provision in relation to property stored in warehouses of class “B; ” but the fourteenth section of the act speaks of warehouse receipts for property stored in any class of public warehouses, and includes, of course, class “B” as well as “A."
*177 There is nothing to show *hat the money advanced by the bank to the bankrupts was specifically appropriated in the purchase of the apples covered by the receipts; but they seem to have been paid for as other purchases were, by checks on the bank, drawn on the general account of the bankrupts. Independent of the fact that there is no evidence to show any other receipt issued by the bankrupts, as warehousemen, for property deposited in their warehouse, and of the fact claimed, that these were receipts, given by ibem, of their own property in the warehouse, substantially tc themselves, (the son of one of the bankrupts being merely a nominal party, in whose name the receipts were issued, and who indorsed them to the bank,) the receipts can hardly be considered as valid under the statute. They are as follows: “Beceived of Cortland Yan Camp, subject to his order, and deliverable on return of this receipt, 150 barrels of apples, for storage in fruit house.” Signed by the bankrupts, and indorsed by Cortland Yan Camp. The other receipts are similar.
Now, the statute of the state in relation to warehouses of class “B,” provides for property stored therein “for a consideration,” which can hardly be said to be true of the property in this case, as it belonged to the bankrupts themselves, by whom the receipts were issued. And the law also declares that all warehouse receipts for property stored in warehouses of cl?ss “B” should distinctly state on their face the brand or distinguishing mark of the property, which these receipts did not state, and so were not within the terms of the statute. I think, therefore, under all the circumstances of the case, they cannot be considered to come within the meaning of the special statute in relation to warehouses of class “B. ” Indeed, that is hardly claimed by counsel; and so the case must turn upon the general law upon the subject.
If this had been a sale of the property to the bank, and these receipts had been given upon the sale, there would, perhaps, not be so much difficulty about the case. Biit that is not claimed by the bank, and it is clear from the facts that *178 there was no sale, unless the circumstances attending the transaction amounted to a sale. In nearly all the eases which have been cited in support of the decree herein the court found that there was a sale of the property. For instance, in Gibson v. Stevens, 8 Howard, 384, the case proceeds throughout upon the assumption that the party through whom the-plaintiff claimed the property had purchased it of the ware-housemen, who issued the receipts therefor. It was the case, therefore, of a sale of property for which receipts were given, and in consequence of which the vendors became bailees of the purchasers, and so the title of the property was in the purchasers or in their assignees by virtue of the indorsement, of the warehouse receipts.
The case of Gibson v. Chillicothe Bank, 11 Ohio St. 311, was in many respects like this, and there would seem, from a statement of the evidence, to be strong grounds for the claim that it was a case of mere security, although the contract under which the advances were made and the receipts given in that case are not set forth; but the court found that the receipts were not merely given as security, but that the money was advanced upon an agreement that the title of the property was passed when the receipts were given; and that it was to be held for the payment of the advances made.
In Yenni v. McNamee, 45 N. Y. 614, the court referred to the difference between the case of a sale of property for which a receipt was given, and one where it was a mere security, distinguishing the case from that of Gibson v. Stevens, and bolding that as the property was held merely as a security, and there was not an absolute sale, it came within the principle of a mortgage of chattels, and, the law of the state not being complied with, it was invalid as against other creditors.
In the case of Shepardson v. Green, 21 Wis. 539, the owners of coal gave a warehouse receipt to the plaintiff for a certain quantity of coal then in their possession. They treated the coal as their own, and sold portions of it to their customers, appropriating the proceeds to their own use, and afterwards *179 a third person purchased all the coal which the parties who had given the warehouse receipts then had in their possession. The court found against the- warehouse receipts in that case, and the judgment was affirmed by the supreme court on the ground the receipt was given as a security only, and in the nature of a chattel mortgage. There seems to have been a misapprehension by the counsel on both sides in this case as to the effect of the decision of the court in that case.
The question arose in a different form in the case of Shepardson v. Cary, 28 Wis. 34, where the court intimates (although it was clearly not necessary to the decision of that case, as they held that the former judgment was a bar to the latter) that a warehouse receipt given by a warehouseinan transferred the property, and the implication is that if it had appeared in the former case that the parties who gave the receipt were regular warehousemen, that the decision would have been different in Shepardson v. Green. In Shepardson v. Cary this language is used by the court, in referring to Gibson v. Stevens and Gibson v. Chillicothe Bank, and to Rice v. Cutler, 17 Wis. 351: “Such relation and the consequent rights and obligations of the parties are held by the decisions just referred to, even where the. sale is made as collateral security for the payment of a debt due from the warehouseman, not to be affected by the statute regulating the filing of mortgages of personal property, nor by the act concerning warehouse receipt» and bills of lading,” which language can hardly be said to be justified, as we have already seen, either by the case of Gibson y. Stevens, or by the case of Gibson v. The Chillicothe Bank; and Rice v. Cutler was, like the others, one of sale, and not of mere security.
There may be some question, perhaps, whether the parties, having relied upon a title under the statute of this state in relation to warehouses, can change their ground and rely upon the efficacy, at common law, of the receipts which were given; but, waiving that question, there not having been any actual sale of the apples in this case, in' order to render the contract valid as to creditors there must have been a pledge *180 ■or a mortgage of the property. As already stated, the bank has not proceeded upon the assumption that there was a sale of the property, but only that it had a lien for the money loaned. There was no pledge of the property, because the possession was not with the pledgee. Possession, actual or constructive, is in general indispensable to the validity of a pledge as against creditors. Neither was there any valid mortgage of the property, because there was no possession in the mortgagee, nor was there, in fact, any written mortgage. If the receipts, and the circumstances connected with them, constituted a mortgage, then it was not recorded, as required by the statute of Indiana. Under the facts, I cannot regard this as anything more than a security given by the bankrupts to the bank for the loan that was made. It therefore was in the nature of a chattel mortgage, and, for the reasons already stated, as such it was invalid under the statute. Undoubtedly this was a valid contract as between the parties, and it is claimed it was therefore valid as against the creditors of the bankrupts, because the assignee, it is insisted, can be in no better position than the bankrupts themselves, he simply being the representative of the bankrupts, and standing as they stood in relation to their rights and equities.
But that I do not understand to be the true rule in cases of this kind. The assignee represents all the creditors of the bankrupts. He occupies as such a different position from that of the bankrupts themselves. This has always been the rule established in this circuit, and I think is the better rule. The reasons for it have been given In re Gurney, 7 Biss. 414. They are also stated by Mr. Justice Strong in Miller v. Jones, 15 B. Reg. 150. The same rule is also laid down in the case of Allen v. Massey, 17 Wall. 351. If it once be admitted that the contract which is the subject of controversy is fraudulent as to creditors, then, by the express provision of the bankrupt law, it is competent for the assignee to attack it, and to cause it to be abrogated for the benefit of creditors. I think that the assignee has the right of a judgment creditor, where the mortgage or the pledge is invalid in consequence of wanting *181 any element requisite under the law or under the statute. This is the rule laid down In re Gurney, and also in Miller v. Jones. In the latter case, while admitting there are decisions to the contrary, Strong, J., says: “The adjudication of bankruptcy is equivalent to the recovery of a judgment and a levy.” It seems to me that any other rule than this would be fatal to the rights of creditors, and would render the bankrupt law in one particular almost entirely inoperative.
It is also claimed, on the part of the bank, that the bankrupts received a considerable fund at the time this contract was made which went to increase their estate, and, therefore, it not being a security given for an antecedent indebtedness, but for money actually received at the time, it ought to be held valid. Undoubtedly there are distinctions between a case where an effort is made to secure or pay a precedent debt, and that where money or property is received at the time by the bankrupt as a part of the contract which is the subject of investigation; but that circumstance alone cannot render a. contract valid as against creditors which otherwise is unlawful, because that would enable one creditor to obtain a priority of payment over another; and to hold the contract valid in this case would give the bank a preference over the general creditors of the bankrupt, which ought not to be allowed unless the contract is in all respects valid. This principle is recognized, and the law as to pledges and the rights of an assignee in bankruptcy as the representative of the creditors stated, in. Casey v. Cavaro, 6 Otto, 467.
The result is that the decree of the district court must be-reversed, and the bank stand as a common instead of a preferred creditor of the bankrupt's estate.