FOURTH ST. NAT. BANK v. MILLBOURNE MILLS CO.'S TRUSTEE.

In re MILLBOURNE MILLS CO.

(Circuit Court of Appeals, Third Circuit.   August 10, 1909.)

No. 38, October Term, 1908.

1. BANKRUPTCY (§ 185*) — PLEDGE OF PERSONAL PROPERTY — VALIDITY AS AGAINST TRUSTEE.

Unlike an assignee for the benefit of creditors, who has no rights beyond those of his assignor, by whose voluntary act the assignment was made, a trustee in bankruptcy takes title by operation of law entirely independent of the bankrupt, and is expressly invested with the rights of creditors, and with authority to avoid any transfer by the bankrupt of his property which any creditor might have avoided under which he may avoid a pledge invalid for want of delivery.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 234, 235; Dec. Dig. § 185.*]

2. FRAUDULENT CONVEYANCES (§ 138*)—DELIVERY OF POSSESSION—ISSUANCE OF WAREHOUSE RECEIPTS BY OWNER OF PROPERTY.

A man cannot make a warehouse of himself as to his own goods, and by issuing and pledging warehouse receipts make a valid transfer as against his creditors of property which remains in his possession and under his control, without anything to distinguish it from his other property or to indicate that he is not the unqualified owner.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Dec. Dig. § 138.*]

3. BANKRUPTCY (§ 140*)—PROPERTY PASSING TO TRUSTEE—ATTEMPTED PLEDGE OF PROPERTY.

A bankrupt milling company in Pennsylvania prior to bankruptcy had issued wheat and flour certificates each calling for a certain quantity of wheat or flour stored in its grain tanks or mill, to be delivered to the holder on demand, and had indorsed such certificates as collateral security for loans. The wheat called for by such certificates was an undivided part of that contained in its grain tank, which was a shifting quantity; the wheat being run from such tank into the mill as needed for grinding. The flour certificates each called for a certain number of barrels set apart in its storage rooms, which were so set apart, but were in no way marked to indicate a pledge nor to negative the ostensible ownership of the company. *Held*, that there was no such delivery as to constitute a valid pledge under the settled law of the state, and that title to the wheat and flour passed to the trustee in bankruptcy, as property which might have been levied on and sold under process against the bankrupt.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

4. BANKRUPTCY (§ 188*)—EQUITABLE LIENS—VALIDITY AS AGAINST TRUSTEE.

A transaction intended as a pledge of property, but which for want of delivery is ineffectual as a pledge, does not create an equitable lien as against a trustee in bankruptcy, who represents the general creditors of the pledgor.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 188.*]

Buffington, Circuit Judge, dissenting.

Petition for Review from the District Court of the United States for the Eastern District of Pennsylvania.

For opinion of court below, see In re Millbourne Mills Co., 162 Fed. 988.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Henry S. Drinker, Jr., and H. Gordon McCouch, for petitioner.
John G. Johnson, for trustee.

Before GRAY and BUFFINGTON, Circuit Judges, and ARCH-BALD, District Judge.

ARCHBALD, District Judge. The question involved in this case is the validity, as against the trustee, of certain pledges or attempted pledges of grain and flour on store at the mills of the bankrupt company. The company issued certificates, after the manner of a warehouse, of the quantity of these commodities on hand, on the strength of which, as collateral, loans were secured from time to time; the property, however, remaining in the possession and under control of the company, and there being nothing outside of the certificates to indicate the rights of the certificate holders to it. By agreement the property was sold by the trustee and the money brought into court for distribution, where the pledges were held to be invalid for want of possession taken; the money being awarded to the trustee for the benefit of the estate. And thereupon this petition was prosecuted.

By the express provisions of the bankruptcy act, § 70 a, the trustee is vested with the title of the bankrupt by operation of law as of the date of the adjudication to all (5) property which prior to the filing of the petition might have been levied upon and sold under judicial process against him; and is authorized (section 70 e) to "avoid any transfer by the bankrupt of his property which any creditor of said bankrupt might have avoided." It is also provided (section 67a) that "claims, which for want of record or for other reasons," would not be "valid liens as against the claims of creditors of the bankrupt shall not be liens against his estate"; and (b) "whenever a creditor is prevented from enforcing his rights as against a lien created or attempted to be created by his debtor, who afterwards becomes bankrupt, the trustee of the estate of such bankrupt, shall be subrogated to and may enforce such rights of said creditor for the benefit of the estate."

It follows as a necessary consequence from these enactments, unless the plain terms of the statute are to be disregarded, that, if creditors in any given case would have the right to call in question the transaction, the trustee as their representative is entitled to do so also. Indeed, unless the rights of creditors are preserved and protected in some such way, bankruptcy, instead of being in their interest, as supposed, is an actual disadvantage, taking from them that which they otherwise would have. Nor is this representation confined to creditors who have liens on the property of the bankrupt, but applies equally to those by simple contract only, whose rights are no different, except that until judgment and execution they are simply not in a position to assert them. Skilton v. Codington, 185 N. Y. 80, 77 N. E. 790, 113 Am. St. Rep. 885. It may be, as said in Thompson v. Fairbanks, 196 U. S. 516, 25 Sup. Ct. 306, 49 L. Ed. 577, that "the trustee takes the property in cases unaffected by fraud in the same plight and condition that the bankrupt himself held it"; or, as it is put in York Manufacturing Company v. Cassell, 201 U. S. 344, 26 Sup. Ct. 481, 50 L. Ed. 782, that he "stands simply in the shoes of the bankrupt." But it is also true, as

declared by the same high authority in First National Bank v. Staake, 202 U. S. 141, 26 Sup. Ct. 580, 50 L. Ed. 967, that "the rule that the trustee takes the estate of the bankrupt in the same plight as the bankrupt held it is not applicable to liens, which, although valid as to the bankrupt, are invalid as to creditors"—a qualification which it is of the utmost importance to bear in mind here.

There is no analogy to the position of an assignee for the benefit of creditors under the state law, and the decisions relied on with that idea (Vandyke v. Christ, 7 Watts & S. [Pa.] 373; Wright v. Wigton, 84 Pa. 163; and Smith v. Equitable Trust Company, 215 Pa. 418, 64 Atl. 594) are misleading and do not apply. An assignment is the voluntary act of the debtor, who can confer no authority which he does not himself have, and whose assignee is therefore limited to the same extent that he is; while a trustee in bankruptcy, as we have seen, takes title by operation of law, entirely independent of the bankrupt, and is expressly invested with the rights of creditors, which he is authorized to enforce. The position of a trustee in insolvency, on the other hand, is squarely in point, taking title by operation of law as he also does, and being similarly authorized to avoid the fraudulent acts of the insolvent in the interest of creditors. Tams v. Bullitt, 35 Pa. 308; Ruff v. Ruff, 85 Pa. 333, 336. "A voluntary assignee for the benefit of creditors," says Chief Justice Mitchell, in Printing Press Company v. Publishing Company, 213 Pa. 207, 62 Atl. 841, "is a mere representative of the debtor and is bound where he will be bound. Wright v. Wigton, 84 Pa. 163. But Tams v. Bullitt establishes the distinction that when the assignee, trustee, or whatever he may be called, derives his authority, not from the mere voluntary act of the assignor, but from the mandate of the law, even when enforced, by the language of that case, through a 'compulsory assignment' from the debtor, in the interest of the creditors, he represents the latter and is vested with their powers."

It was, accordingly, held, in Bank of Alexandria v. Herbert, 8 Cranch, 36, 3 L. Ed. 479, that the trustee of an insolvent, representing creditors, was entitled to take advantage of a defect in the recording of a mortgage, although the insolvent himself could not. "In reason," says Chief Justice Marshall, "there can be no difference between this statute, which asserts the right of the creditors, in the mode prescribed by law and an assertion of that right in their own names." And in line with this, in Moors v. Reading, 167 Mass. 322, 45 N. E. 760, 57 Am. St. Rep. 460, and Drury v. Moors, 171 Mass. 252, 50 N. E. 618, a trustee in insolvency, as the representative of creditors, was allowed to recover personal property which had been inadequately pledged.

The same principle applies also to a receiver, appointed by court, upon a creditor's bill, who derives authority, as it is said, not at all from the debtor, but from the court, acting in the interest of creditors, and for the enforcement of their rights (Printing Press Company v. Publishing Company, 213 Pa. 207, 62 Atl. 841), a view to which this court is committed by the decision in Porter v. Boyd, 171 Fed. 305, in which it was enforced in favor of the receiver of an insolvent corporation as against chattels held under a conditional sale. And so does it, to the receiver of a national bank, who, in Casey v. Cav-

aroc, 96 U. S. 467, 24 L. Ed. 779, was held entitled to maintain a bill to recover securities, which had been agreed to be pledged, but failed of being so, for want of delivery; the authority for this being most significantly drawn by analogy from that of an assignee (now trustee) in bankruptcy, a receiver to wind up a bank being regarded as occupying an equivalent position. "That an assignee in bankruptcy has this power," as is there said, "cannot well be doubted." And in Security Warehousing Company v. Hand, 206 U. S. 415, 27 Sup. Ct. 720, 51 L. Ed. 1117, a trustee in bankruptcy was allowed to avoid a pledge of personal property, invalid for want of delivery, on the ground that this could have been done by creditors, the very case which we have here.

"By section 70a," says Mr. Justice Peckham, "the trustee in bankruptcy is vested by operation of law with the title of the bankrupt to all property transferred by him in fraud of his creditors, and to all property which, prior to the filing of the petition, might have been levied upon and sold by judicial process against him; and by subdivision 'e' of the same section the trustee in bankruptcy may avoid any transfer by the bankrupt of his property, which any creditor of the bankrupt might avoid, and may recover the property so transferred or its value. Here are special provisions placing the title to the property transferred by fraud, or otherwise as mentioned, in the trustee in bankruptcy, and giving him the power to avoid the same."

And again:

"The title to this property was in the knitting company. There had been no valid pledge of it, because the possession had been at all times in the knitting company, and it could have been levied upon and sold under judicial process against the knitting company at the time of the adjudication in bankruptcy. The security company had, of course, full knowledge that the knitting company in fact at least shared in the possession of the property. It was itself an actor, or it acquiesced in the arrangement under which it had, at most, but a partial possession, and even that was subject to the control of the knitting company."

Distinguishing the case of York Manufacturing Company v. Cassell and others of like character, preceding it, it is further said:

"The case at bar bears no resemblance in its facts to the cases just cited. There was no valid disposition of the property in the case before us, or any valid lien. The so-called 'warehouse receipts' issued by the warehousing company to the knitting company, upon the facts of this case, gave no lien under the law in Wisconsin, in which state they were issued. In such case this court follows the state court."

The present case arises out of an attempt, by the bankrupt, a milling company, to pledge its property for money advanced, while still retaining possession and dominion over it. The form adopted was the issuing of so-called "certificates," for so much grain or flour, in store at the mills; these certificates being issued to different parties, as collateral to loans, somewhat like ordinary warehouse receipts. The grain in question was contained in tanks, adjoining the mills, from which it was run to the mills, to be made into flour, by means of a conveyor, by simply unlocking a slide. It was drawn upon freely, in this way; no definite quantity being kept on hand, and there being no special arrangement with the holders of certificates, with regard to it, except that it was not to be reduced beyond the amount called for thereby. The fact is that it was a shifting quantity, sometimes running far below this, although sometimes possibly above it; there being certificates

outstanding at the time of bankruptcy for 138,000 bushels, while there were but 83,000 bushels on hand. The difference is ascribed to the depredation of insects, by which the grain became heated and lost weight; but it is difficult to see how 55,000 bushels could have disappeared in that way. Nor is it material, the fact being, from whatever cause, that it was not there.

The arrangement with regard to the flour was somewhat similar. It was stored in barrels in the basement of the company's warehouse under the charge of the superintendent, in three sections, two of 200 barrels each, and one of 800 barrels, divided off from each other, by upright posts, and all bearing a certain common brand. There was also a sign that it was not to be touched by an employé; but, aside from what this might vaguely imply, there was nothing to indicate that there was any control or ownership over it other than that of the bankrupt company in whose possession it was. Differing from the grain, there was no change in the quantity of the flour from the start, and certificates for the whole 1,200 barrels were issued to the one bank.

It is clear, upon this showing, that the certificate holders have no case. The certificates, admittedly, cannot be sustained as warehouse receipts, however they may bear that form. A man cannot make a warehouse of himself as to his own goods. Bank v. Kent Mfg. Co.. 186 Pa. 556, 40 Atl. 1018; Security Warehousing Company v. Hand. 206 U. S. 415, 27 Sup. Ct. 720, 51 L. Ed. 1117. Neither, there having been no delivery of the property, was there a valid pledge. The lien of a pledge, undoubtedly, is preserved in bankruptcy. Hiscock v. Varick Bank, 206 U. S. 28, 27 Sup. Ct. 681, 51 L. Ed. 945. But to have this so, the essentials of a pledge must appear, to which possession is indispensable; there being no lien, as there is no pledge, without it. "The requirement of possession," says Mr. Justice Bradly, in Casey v. Cavaroc, 96 U. S. 467, 490, 24 L. Ed. 779, "is an inexorable rule of law adopted to prevent fraud and deception, for, if the debtor remains in possession, the law presumes that those who deal with him do so on the faith of his being the unqualified owner of the goods."

It is true that a symbolical or constructive delivery is recognized in favor of articles of great bulk or difficulty of handling; but the policy of the law is against the relaxation of the rule. Sholes v. Asphalt Company, 183 Pa. 528, 38 Atl. 1029. And even as to these there must be a surrender of dominion and a setting apart of the property, with such distinctive marks as will serve to indicate that, while in the apparent possession of the owner, it is not in fact his. Philadelphia Warehouse Company v. Winchester (C. C.) 156 Fed. 600. As is well said by Judge Bradford in that case, there must be enough to negative ostensible ownership, nothing of which is to be found here. The grain in question was a shifting quantity, sometimes more and sometimes less; the number of bushels called for by the several certificates being also simply an undivided portion of the general mass. No specific part was set aside to any particular holder, and much less was there anything to distinguish that it was his. It was his on paper; that is all. And he had to take his chances, whether it would be all there when he wanted it, as in the end, from whatever cause, it was not. Most significant, however, of all, it was open at all times, to be drawn upon as it freely

was, to be manufactured into flour; and it was thus not only retained in the immediate and undistinguished possession but in the complete and unrestricted dominion and control of the owners, who, to meet the needs of their business, converted and sold it at one end faster than it was replaced at the other. This never has been and never will be regarded, by the most liberal construction, as meeting the requirement of delivery, so as to create a valid pledge.

Nor is the case of the flour practically any better, although in some respects not quite so bad. It is true that it was set apart by itself in the basement of the company's warehouse, and that the original 1,200 barrels were not broken in upon or disturbed. It was also marked not to be touched by the employés, and was under the special charge of the superintendent, although not as the agent of the certificate holders, so far as appears, whatever advantage, under the circumstances, that might be. Drury v. Moors, 171 Mass. 252, 50 N. E. 618. But the vital thing lacking, the same as in the case of the grain, was that there was nothing to negative the apparent ownership of the bankrupt company, in whose possession, and under whose control, to all intents and purposes, it was. Without this, it was presumptively, as it was actually, theirs, subject only to such rights as against the company, as the certificate holders might be entitled to assert before the rights of creditors had attached, with which, at this time, we are not concerned. To preserve the rights of such holders, as against creditors, either by way of equitable lien or pledge, it had to be openly and clearly indicated that the flour was theirs, without which the mere storing of it, by itself, in the basement, which in effect was all that was done, was of no avail. Sholes v. Asphalt Company, 183 Pa. 528, 38 Atl. 1029; Barlow v. Fox, 203 Pa. 114, 52 Atl. 57; Moors v. Reading, 167 Mass. 322, 45 N. E. 760, 57 Am. St. Rep. 460; Drury v. Moors, 171 Mass. 252, 50 N. E. 618; Casey v. Cavaroc, 96 U. S. 467, 24 L. Ed. 779; Security Warehousing Company v. Hand, 206 U. S. 415, 27 Sup. Ct. 720, 51 L. Ed. 1117; Adams v. Merchants' National Bank (C. C.) 2 Fed. 174; Thurber v. Oliver (C. C.) 26 Fed. 227; In re Gebbie (D. C.) 167 Fed. 609.

In Sholes v. Asphalt Company, 183 Pa. 528, 38 Atl. 1029, there was an attempted pledge of asphalt blocks as collateral security for a note; the blocks being stored in the company's yard. Neither at the time of making the note, nor afterwards, as it is stated in the opinion, was anything done by either of the parties to carry the pledge into effect. The pledgor did not deliver the goods, nor did the pledgees remove or take possession of them, either actually or constructively. The goods were not even separated, marked, or in any way distinguished from the unpledged assets of the company, and it was held, as against a receiver under a creditor's bill, that the pledge could not be sustained. "The rule," says Fell, J., "is that delivery is essential to the contract of pledge. It is true that the rule has been relaxed in cases where, because of the nature of the thing pledged or for other reasons, the requirement of delivery would be such a hardship as to defeat the purpose of the contract; but the policy of the law is against such relaxation, and it has been mainly confined to cases in which the goods have

remained in the possession of the pledgor as agent of the pledgee under an express agreement to that effect. Even in such cases the want of constructive or symbolical delivery, or of some act whereby the goods pledged may be distinguished and set apart from the other goods in the possession of the pledgor, has not been excused. Here we have no evidence of such an agreement, or of anything in the nature of a constructive delivery; and to relax the rule for any other reason sufficiently to include such a case as this would be to abrogate it entirely."

This case is of especial importance, not only as determining the necessity, even as to bulky articles, for at least a constructive delivery, in order to create a valid pledge, and what is requisite to make that out, but also, as emphasizing the fact that, under the local law, the rights of general creditors, although having no lien, and only repre- sented by a receiver, are superior, and must prevail over those of a pledgee, who has never had possession; it being to these rights, as we have seen, that a trustee in bankruptcy, representing creditors, suc- ceeds.

So in Barlow v. Fox, 203 Pa. 114, 52 Atl. 57, there was an attempt- ed pledge, by bill of sale, of the personal property in a hotel; but there was no delivery of the goods, and, the pledgors having become bankrupt, the trustee took possession and made a sale, and the title of the purchaser was sustained, as against the pledgee. This case is squarely in point; the pledge being held invalid as against the trus- tee in bankruptcy, representing creditors, there having been no deliv- ery, constructive or otherwise, of the goods pledged, showing how the question is regarded by the state courts, which, according to Se- curity Warehousing Company v. Hand, 206 U. S. 415, 27 Sup. Ct. 720, 51 L. Ed. 1117, is controlling here.

In Girard Trust Company v. Mellor, 156 Pa. 579, 27 Atl. 662. Barker Bros. & Co., bankers, of Philadelphia, desiring to secure those whose money they had taken for subscriptions to the stock of a com- pany which was being formed abroad, inclosed in an envelope certain notes and bonds, which, with a list of the persons intended to be pro- tected, they placed in a tin box, which they confided to the custody of a safe deposit company; the package being indorsed as' containing securities held as collateral against the subscription deposits made. Having shortly afterwards failed and made an assignment for the ben- efit of creditors, it was held that. as against such assignment, the attempted declaration of trust was of no avail. "As a general rule in this state," says Chief Justice Sterrett, "a debtor cannot, as against his creditors, assign personal property as security, etc., and at the same time retain the possession thereof as theretofore. Possession must accompany the transfer as an essential part thereof. If the property is permitted to remain in the exclusive possession and control of the assignor, the transaction, while good as against himself, is a construc- tive or legal fraud upon his creditors, and may be so treated by them. To hold that exclusive possession may be retained by the debtor pro- vided he agrees to hold as trustee until the same is demanded by his creditors or until default is made, would be to permit that to be done secretly and by indirection which the law condemns when done di-

rectly and openly. This principle is so firmly grounded in our jurisprudence that no court of equity should lend its aid in the enforcement of a transaction which is not in harmony with the settled law on that subject. We think the transaction in question clearly belongs to that class."

This case is particularly significant, in that creditors were represented by an assignee by deed of voluntary assignment, who is supposed to stand squarely in the shoes of the assignor, but as against whom the attempted pledge was nevertheless declared void.

It is said, however, that in First National Bank v. Pennsylvania Trust Company, 124 Fed. 968, 60 C. C. A. 100, a pledge of steel billets was sustained by this court, as against a trustee in bankruptcy, under circumstances similar to those of the case in hand; but, while the billets there remained on the premises of the pledgor, they were marked by signs, posted on the several piles, giving notice of the claim of the bank, which clearly distinguishes it from anything which we have here. "To complete its title or lien as against creditors and strangers," says Judge Kirkpatrick, "the bank was not obliged to take the billets into actual possession. It was sufficient to give notice of their lien, or change of ownership. This they did by posting on the billets, which were in distinct and separate piles, the signs to which reference has been made." There was thus in that case an assertion of lien in favor of the pledgee and a denial of ownership in the pledgor, which entirely satisfied the law, and made the pledge good—nothing of which is to be found here.

The case of Davis v. Crompton, 158 Fed. 735, 85 C. C. A. 633, is also relied on, but is not in point. The transaction which was there sustained was a conditional sale, in which, by express agreement, the title never passed, being retained by the vendor until payment in full was made. That this is a valid stipulation in many jurisdictions is shown by Harkness v. Russell, 118 U. S. 663, 7 Sup. Ct. 51, 30 L. Ed. 285, where the subject is fully discussed; and, the property having been accepted upon these terms, it was held that the trustee, the same as the bankrupt, was bound thereby. But that is very different from anything which we have here, where not only the possession but the title was in the bankrupt company; there being nothing but the agreement that the property should stand pledged in their hands, a secret lien which the law does not permit.

It is, however, contended that, there being an intent to pledge, an equitable lien was at least created, which entitles the certificate holders to the fund. It is difficult to see how a transaction, which, for want of delivery, is ineffective as a pledge, can be pieced out, so as to make it hold as something else. There would be little left to the established doctrine with regard to pledges, if that was the case; and it is somewhat singular that, in all the litigation, where pledges of personal property have been upset, for want of a delivery, no one should have discovered this easy way out. This is not to say that an equitable lien, under some circumstances, may not exist; but only that there is nothing to support it here. It never arises or is enforced except against property in the hands of a party to the original transaction out of which it is claimed to grow, or his voluntary representatives, or one

who has notice of it and is affected with it as a superior right; within which all the cases cited in support of it will be found to fall. 19 Am. & Eng. Enc. (2d Ed.) 36. It is not good as against a trustee in bankruptcy, taking title, in the interest of creditors, by operation of law, as is the case here. In re Olzendam Company (C. C.) 117 Fed. 179; In re Liberty Silk Company (D. C.) 152 Fed. 844; Casey v. Cavaroc, 96 U. S. 467, 491, 24 L. Ed. 779; Printing Press Company v. Publishing Company, 213 Pa. 207, 62 Atl. 841.

There is nothing to the contrary of this in Hurley v. Railroad, 213 U. S. 126, 29 Sup. Ct. 466, 53 L. Ed. 729. True, an equitable right or lien was there recognized as against a trustee in bankruptcy, but upon materially different facts. The railroad there, in whose favor it was held to exist, was a party to the tripartite agreement by which the bankrupt acquired the right to mine the coal against which it was enforced, which he agreed to mine and deliver to the railroad at a certain price; the railroad on failure to comply having the right to enter and avoid the lease. It was with these relations to the property that the railroad, anticipating its payments, advanced money to the bankrupt for coal not yet mined, in order to enable the company to go on with its mining business; and it was in return for this that the delivery of a certain amount of coal was claimed and allowed. The transaction, as it was said, was not one of ordinary borrowing and lending on credit or security, but constituted, from an equitable standpoint, a pledge or hypothecation of the unmined coal to the extent of the advancements made, with which, in view of the reciprocal rights and relations of the parties, the trustee, equally with the bankrupt, was bound to comply. It is manifest that this has nothing in common with the case in hand.

The question of equitable lien is met and effectively disposed of by the Court of Appeals of the Seventh Circuit in Security Warehousing Company v. Hand, 143 Fed. 32, 74 C. C. A. 186, affirmed 206 U. S. 415, 27 Sup. Ct. 720, 51 L. Ed. 1117, which cannot be distinguished from the present case. "The appellant lenders [certificate holders here] finally assert," says Baker, J., "that, if they have neither the negotiable receipts of a public warehouseman, nor a pledge through an unequivocal possession by their agent, the security company, nevertheless they have 'equitable liens' which entitle them to the possession of the property as against the trustees. The trustee succeeds, as of the date of the adjudication, not only to the bankrupt's title and possessory right to the property, but also to the right of the bankrupt's creditors to assert that the title and possessory right as to them is in the bankrupt. Sections 70a(4) and 70a(5), 70e. * * * Liens that remain undisturbed are those that were good against both the bankrupt and his creditors immediately preceding the adjudication. * * * The conclusion results not merely from a consideration of the nature of the trustee's succession, but as well from the inhibitions of the act. Section 67a vitiates as liens 'all claims which for want of record or for other reasons' the bankrupt's creditors might have avoided as liens; that is, no secret liens or equities shall prevail against the trustee that were not good against the general unsecured creditors represented by the trustee. Section 67d protects 'liens given or accepted in good

faith * * * and for a present consideration, which have been recorded according to law, if record thereof was necessary in order to impart notice.' The liens thus saved are liens, not promises to give liens, not equitable claims, that what ought to have been done shall be considered done, but liens perfected according to law. 'Notice' as well as 'a present consideration' is necessary. If a chattel mortgage be given in good faith and for a present consideration, recording is not obligatory; but the imparting of notice is. Recording is one way; another is actual and continued change of possession. If a pledge be similarly given, recording is not 'necessary in order to impart notice,' because no provision has been made that a record of the fact shall be notice of the fact; but what is 'necessary in order to impart notice' is. the delivery of exclusive and unequivocal possession. We think that section 67d does not change section 67a into the meaning that 'claims, which for want of record or for other reasons' are not good liens as against creditors, are good liens as against the estate if the lender advanced his money without any actual intent to defraud unsecured creditors. He is chargeable with the constructive intent which is attributed to secrecy."

This case was affirmed, it is to be noted, and while this particular feature of it was not alluded to, except in passing, it was not disturbed. Much less did any one undertake to urge before the Supreme Court that what was not good as a pledge for want of delivery might be sustained as an equitable lien. It leaves no place, in our judgment, for the idea, which is now advanced, that any such claim can be asserted as to personal property ineffectually pledged to the detriment of general creditors acting through a trustee in bankruptcy or other representative taking title in their interest by operation of law.

The decision under review is made to rest upon this case, by which, as we view it, it is fully sustained, and should therefore be affirmed.

BUFFINGTON, Circuit Judge (dissenting). In the court below the Fourth Street National Bank of Philadelphia asserted a lien on the proceeds of certain wheat in bulk and on 1,200 barrels of flour of the Millbourne Mills Company, the bankrupt, which lien it claimed to have as security for loans made by the bank to said company. That court denied such lien and awarded the fund in question to the trustee in bankruptcy. Thereupon the bank filed this petition to review. The facts of the case are that more than four months prior to its bankruptcy the Millbourne Mills Company obtained loans from the bank on notes, and at the same time gave as security therefor its indorsed certificates, which, in the case of the flour, were as follows:

"Flour Certificate.

"Millbourne Mills Company.

"No. 1. Philadelphia, March 8, 1907.

"This is to certify that Millbourne Mills Company has stored in its warehouse, basement floor, section A, * * * 200 barrels of flour, branded U, * * * which will be subject to its order, and only deliverable upon the indorsement and surrender of this certificate.

"George B. Hicks, Jr., Supt. of Warehouse.

"Countersigned: R. S. Dewees, President.

"Flour Certificate."

This flour was branded "U" on the barrels which were stored in a basement warehouse of the mill. The flour was divided into marked-off sections by upright posts, in each of which a certain number of barrels were stored. These were described by marks and were further identified by the exact number of barrels in the separate certificates which were issued for each lot. By agreement of the parties the flour remained in the mills company's warehouse and in the special custody of Hicks, its superintendent. After the certificates were issued, a notice was posted, "None of this flour to be touched by any employé," and pursuant to the agreement no flour was used; but it remained intact until after bankruptcy, when, on assertion of a lien thereon by the bank, it was, by agreement of the parties, sold by the trustee, and the proceeds, which were less than the bank's notes, substituted for the flour.

Two questions arise in this case: First, as between the mills company and the bank, did the latter, under the law of Pennsylvania, at the time of bankruptcy, have an equitable lien on this flour? Secondly, if so, did the trustee take the flour subject to such lien? The first question is to be settled by the Pennsylvania state decisions. "The question of the extent and validity of the pledge were local questions and the decisions of the court of New York are to be followed by this court." Hiscock v. Varick Bank, 206 U. S. 28, 27 Sup. Ct. 681, 51 L. Ed. 945, and cases cited. The second question depends on the bankrupt law and federal decisions.

In taking up the first question, it should be noted in limine that the case before us is one of entire good faith. It was a business transaction of unquestioned integrity and supposed efficacy. It was not the sort of transaction involved in Security Company v. Hand, 206 U S. 415, 27 Sup. Ct. 720, 51 L. Ed. 1117, where not only was the attempted pledge void under the laws of Wisconsin, but was one the Supreme Court designated as "a mere pretense, a sham," which the Circuit Court of Appeals in Security Co. v. Hand, 143 Fed. 32, 74 C. C. A. 186, said, "with regard to Wisconsin law, was a fraud in fact," and which this court in Davis v. Crompton, 158 Fed. 742, 85 C. C. A. 633, stated was "a fraud in fact."

Before turning to the Pennsylvania decisions, we note that equitable liens are a generally recognized means of security, and their nature is thus defined in Pomeroy's Equity, § 1235:

"The doctrine may be stated in its most general form that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, * * * creates an equitable lien upon the property so indicated, which is enforceable. * * * In order, however, that a lien may arise in pursuance of this doctrine, the agreement must deal with some particular property, either by identifying it, or by so describing it that it can be identified, and must indicate with sufficient clearness and intent that the property so described or rendered capable of identification is to be held, given, or transferred as security for the obligation."

This statement, cited and approved in Walker v. Brown, 165 U. S. 654, 17 Sup. Ct. 453, 41 L. Ed. 865, is in accord with numerous federal decisions. Ketchum v. St. Louis, 101 U. S. 306, 25 L. Ed. 999;

Fourth Street National Bank v. Yardley, 165 U. S. 635, 17 Sup. Ct. 439, 41 L. Ed. 855; Burdon Sugar Refining Co. v. Payne, 167 U. S. 127, 17 Sup. Ct. 754, 42 L. Ed. 105; Philadelphia Warehouse Co. v. Winchester (C. C.) 156 Fed. 600; Bridgeport Co. v. Maeder, 72 Fed. 115, 18 C. C. A. 451; Clark v. Sigua Iron Co., 81 Fed. 312, 26 C. C. A. 423; Sheffield Company v. Witherow, 149 U. S. 578, 13 Sup. Ct. 936, 37 L. Ed. 853.

The characteristics of an equitable lien, thus generally recognized, obtain also in Pennsylvania; but the decisions of that state go farther and hold that, where the property pledged is sufficiently designated, retention of the property by the pledgor by mutual consent does not, as between pledgor and pledgee, affect the validity of such lien. The case of Vandyke v. Christ, 7 Watts & S. (Pa.) 373, in which Chief Justice Gibson held that retention of property in a contract of sale, while fraudulent as to creditors by St. 13 Eliz., and as to purchasers by St. 27 Eliz., was not fraudulent between the parties at common law, is the law of that state to-day, and is followed in Wright v. Wigton, 84 Pa. 163, Smith v. Equitable Company, 215 Pa. 420, 64 Atl. 594, and other cases. And that retention of the pledge by the pledgor, where this is by the agreement of the parties, will not, as between pledgor and pledgee, defeat an equitable lien, is held in Collin's Appeal, 107 Pa. 605, 52 Am. Rep. 479, followed in Wallace's Appeal, 104 Pa. 564, where the court, referring to the necessity of a change of possession, said:

"There is, however, a class of cases in which it is disregarded. They are cases in which the possession of the pledge is, by agreement of the parties, to remain with the pledgor. It is held that as the pledgor is bound, notwithstanding this provision of the contract, so are all bound who claim under him, except purchasers for value and without notice."

After a discussion of numerous cases where equitable liens were enforced, although possession was retained by the owner, the court summed its conclusions by saying:

"The foregoing cases all relate to liens upon specific chattels, as to which it is almost universally necessary that possession should accompany the pledge in the hands of the pledgee to validate the lien; but we have seen that this requirement may be dispensed with, if such is the agreement of the parties, and the lien of the pledgee may be enforced by virtue of the contract."

And in Sholes v. Asphalt Co., 183 Pa. 528, 38 Atl. 1029, where there was no separation or identification of the pledge, and it was held there was no lien, yet the exception was recognized where "the goods have remained in the possession of the pledgor as agent of the pledgee under an express agreement to that effect."

From this it will be seen that under the Pennsylvania decisions the bank had an equitable lien on this flour, and had had it for more than four months prior to bankruptcy, and, had the mills company prior to bankruptcy sought to dispose of the flour, the bank could have by bill enjoined it from so doing and on maturity of the note have enforced its lien. Indeed, the validity of the lien under the Pennsylvania decisions was conceded in the opinion of the court below, saying:

"The pledge is, no doubt, good as between the pledgor and pledgee in Pennsylvania as against creditors who have never levied."

The first question must therefore, in accordance with the state decisions, be answered in the affirmative. Such being the case, we then have the status, not of a preference or lien within four months of bankruptcy, but of a lien valid under the state law prior to the bankruptcy, existing for more than four months, and which no provision of the bankrupt law invalidates.

The second question, viz., if so, did the trustee take the flour subject to such lien? must, under the federal decisions (York Co. v. Cassell, 201 U. S. 344, 26 Sup. Ct. 481, 50 L. Ed. 782; First National Bank v. Pennsylvania Trust Co., 124 Fed. 968, 60 C. C. A. 100; Davis v. Crompton, 158 Fed. 735, 85 C. C. A. 633), be also answered in the affirmative, for it is clear that the trustee in bankruptcy simply succeeded to the rights of the bankrupt, and, as conceded in the petitioner's brief, took the property "subject to all of the equities impressed upon it in the hands of the bankrupt."

It is contended, however, that the force of these decisions is qualified by the late case of Bank v. Staake, 202 U. S. 149, 26 Sup. Ct. 584 (50 L. Ed. 967), where it was said:

"The rule that the trustee takes the estate of the bankrupt in the same plight as the bankrupt held it is not applicable to liens which, although valid as to the bankrupt, are invalid as to creditors."

But this language, which the court quoted from the opinion of the Circuit Court of Appeals (133 Fed. 717, 66 C. C. A. 547), must be read in connection with the subject-matter of that case. That subject was an attachment, a "lien created by or obtained in or pursuant to any suit or proceeding at law or in equity," which section 67, clause c, makes void. Under that statute it was sought to subrogate the trustee to the rights of the attaching creditor. It was of such a lien, one obtained by legal process, and which, be it observed, the statute itself declared void, that it was in effect said that the rule laid down in Hewit v. Berlin, 194 U. S. 296, 24 Sup. Ct. 690, 48 L. Ed. 986, and York v. Cassell, supra, that the trustee takes the estate in the same plight that the bankrupt held it, had no application because the lien before them was by the act itself declared invalid. It will thus be seen that the decisions noted are not affected by what was said in Bank v. Staake, supra.

It remains to discuss the wheat. The mills company was engaged in manufacturing flour, and to do so it was forced to carry large amounts of wheat in bulk and in bins. In order to prevent this wheat from overheating, it had to be shifted occasionally from bin to bin. At times it was necessary to withdraw parts of the wheat for grinding. To enable it to purchase and carry this wheat in reserve, the mills company borrowed from the bank on notes, and at the same time delivered to it indorsed wheat certificates in the following form:

"Grain Certificate.

"Millbourne Mills Company.

"No. 2700.                                        Philadelphia, 1906.

"This is to certify that Millbourne Mills Company has stored in its fireproof grain storage tanks 1,000 bushels No. 2 Penna. winter wheat; unloaded from

cars No. ————, which will be subject to its order and only deliverable upon the indorsement and surrender of this certificate.

"Benj. P. Hoopes, Supt. of Elevators.

"Countersigned: R. S. Dewees, President."

These certificates, as originally issued, covered grain in particular tanks for each certificate. The tanks adjoined the mill property and were connected with it by a slide or conveyor. This slide was locked, and by agreement of the parties was kept under lock and key by an employé of the mills company. It was agreed between the parties that the mills company could not withdraw any of this wheat without first paying enough of the loan to effect a release, or furnishing other wheat to take its place. This was always done. Later it was found necessary to shift the grain from tank to tank as the inconvenience to all parties of holding the wheat in individual tanks for individual certificates was found impracticable. To meet this practical necessity, and in good faith, the agreement was therefore modified, so that all the certificates were to cover all the grain in all the tanks of the storage system. As none but the certificates here in question were issued, and as these, owing to loss and depreciation, were, at the date of bankruptcy, more than sufficient to cover all the grain in the bins, no question of identity arose. Indeed, nothing further remained to be done by the lienor at any time, so far as the identity of the pledge was concerned. The agreement as above was kept, the grain remained under lock and key, and as withdrawals were made corresponding reductions were made on the certificates.

To me these propositions are clear:

First. It was the intent of both parties in good faith that the bank should have a lien on these goods, and the bank parted with its money on the strength of that intent.

Second. That under the decisions of the Supreme Court of Pennsylvania an equitable lien on identified personalty is good between pledgor and pledgee where by agreement of the parties possession is retained by the former.

Third. That the trustee in bankruptcy took no higher rights than the pledgor had, but simply succeeded to them.

Fourth. That there is no provision in the bankrupt act which invalidates this equitable lien, which was acquired more than four months before bankruptcy.

Because the effect of this decision is to make the rights of a trustee rise higher than the bankrupt's, by thus striking down a lien which was valid in Pennsylvania, and which is not invalidated by any provision of the bankrupt act, I am constrained to record my dissent.