In re PITTSBURGH INDUSTRIAL IRON WORKS.

(District Court, W. D. Pennsylvania. April 16, 1910.)

No. 3,781.

1. SALES (§ 55*)—WHAT LAW GOVERNS—PLACE OF DELIVERY.
   A contract for the sale of goods is to be construed in accordance with the law of the place where delivery is to be made or the contract to be performed.

   [Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 2, 153; Dec. Dig. § 55.*]

2. SALES (§ 201*)—DELIVERY TO CARRIER—VESTING OF TITLE.
   In general, in the absence of a stipulation, title vests in the buyer on delivery of the goods to the carrier for transportation.

   [Ed. Note.—For other cases, see Sales, Cent. Dig. § 535; Dec. Dig. § 201.*]

3. SALES (§ 55*)—DELIVERY F. O. B.—WHAT LAW GOVERNS.
   Where a contract for the sale of goods provided for delivery f. o. b. cars at Detroit, Mich., and consigned to the buyer, the contract would be governed by the law of Michigan.

   [Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 2, 153; Dec. Dig. § 55.*]

4. SALES (§ 82*)—TERMS—SALE FOR CASH.
   Unless time is stipulated in a contract of sale, the sale is for cash.

   [Ed. Note.—For other cases, see Sales, Cent. Dig. § 230; Dec. Dig. § 82.*]

5. SALES (§ 469*)—CASH ON DELIVERY—RETENTION OF TITLE.
   Where goods were sold under a contract "price $1,160, f. o. b. cars, Detroit, Mich.," and there was nothing to show that any time for payment in the future was contemplated, but the invoice was marked "terms .cash" and "title to the property in this invoice reserved in car company until full payment made," payment of the price was a condition precedent to the passing of title to the buyer unless waived.

   [Ed. Note.—For other cases, see Sales, Cent. Dig. § 1357; Dec. Dig. § 469.*]

6. BANKRUPTCY (§ 140*)—BANKRUPT'S TRUSTEE—TITLE TO PROPERTY CONDITIONALLY SOLD.
   Under the rule that a bankrupt's trustee acquires only such title as the bankrupt had, the trustee acquired no title to property sold to the bankrupt under conditional sale reserving title until the price had been paid; the condition not having been complied with.

   [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 199; Dec. Dig. § 140.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

7. SALES (§ 472*)—CONDITIONAL WILLS—TRANSFER OF PROPERTY—RIGHTS OF TRANSFEREE.

Where title to a derrick car sold under a conditional sale never passed to the buyer because of nonfulfillment of the condition, the buyer's transferee thereof, under the law of Michigan, acquired no right superior to the seller.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 1371; Dec. Dig. § 472.*]

8. PLEDGES (§ 2*)—CONTRACT—WHAT LAW GOVERNS.

A contract of pledge made in Pennsylvania must be construed according to the law of that state.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. § 2; Dec. Dig. § 2.*]

9. BANKRUPTCY (§ 188*)—PLEDGED PROPERTY—VALIDITY OF PLEDGE—POSSESSION.

Where, during the construction and equipment of a derrick car by the bankrupt, it assigned not only the account of the purchaser therefor but the car and equipment, to secure an advancement of the entire purchase price before delivery of the car to the buyer, by which it was subsequently refused for noncompliance with specifications, and the pledgee after bankruptcy acquired possession from the carrier in replevin, the pledge was not invalid under the Pennsylvania law, because possession was not delivered to the pledgee by the bankrupt as against the bankrupt's trustee who never acquired possession.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 188.*]

10. BANKRUPTCY (§ 188*)—ADMINISTRATION OF ESTATE—EQUITABLE LIENS.

A bankrupt, having obtained an order for a railroad derrick car, purchased the car from a foundry company under a conditional contract of sale. It obtained possession without making payment, and while engaged in equipping the car sold and assigned the account against the prospective purchaser, as well as the car, to a bank for an advancement of the full purchase price to enable, it to finance and complete the transaction; the purchaser having agreed to pay to the bank any amount that should be due the bankrupts pursuant to the sale. Held that, the car having been refused by the purchasers for alleged noncompliance with specifications, the bank was entitled to an equitable lien on the equipment to secure its advances, regardless of the validity of the pledge.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 188.*]

11. BANKRUPTCY (§ 188*)—EQUITABLE LIENS—VALIDITY.

An equitable lien, having been acquired more than four months before the filing of a bankruptcy petition, was not invalidated thereby.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 188.*]

In matter of bankruptcy proceeding against the Pittsburgh Industrial Iron Works. Proceedings for the determination of certain liens and the ownership of a derrick car as between the trustee, the First National Bank of Huntingdon, and the American Car & Foundry Company. Judgment for car and foundry company and the bank.

R. T. M. McCready, for trustee.
S. S. Mehard, for American Car & Foundry Co.
Lazear & Blaxter, for First Nat. Bank of Huntingdon.

YOUNG, District Judge. This case comes before us upon the pleadings and agreement of facts and stipulation of counsel for the parties interested, which appear from the record to be the Guaranty Title & Trust Company, trustee of the bankrupt; the First National

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Bank of Huntingdon, which claims certain property set forth in the agreement as having been sold or pledged to it as security for its debt; and the American Car & Foundry Company, which claims certain property set forth in the agreement of facts as its property.

It appears by the agreement of facts that prior to January 1, 1907, the Pittsburgh Industrial Iron Works, the bankrupt, contracted with the Detroit River Tunnel Company to furnish it a certain steel flat derrick car and equipment, and that on or about March 26, 1907, while the bankrupt company was engaged in the manufacture and erection of the equipment for said derrick car, it procured the discount by the First National Bank of Huntingdon of its promissory note for $5,125, and received that sum as the proceeds thereof, and that, at the time of the discounting of that note, the bankrupt executed and delivered to the bank what it alleges is an assignment of the car and its equipment and of the money to be paid for the car and equipment by the tunnel company. That on March 6, 1907, the bankrupt, having arranged for the discounting of the note by the bank, gave the Detroit Company notice in writing to pay the sum of $5,125 to the bank instead of to the Pittsburgh Industrial Iron Works, and that the Detroit Company notified the bank that it would pay the money upon said contract to the bank. It also appears from the agreement of facts that on April 3d the derrick car and equipment were tendered to the Detroit Company, which refused to accept them because they were not satisfactory under the contract, the same being returned to the Industrial Company on May 17th, and that the car and equipment remained in the possession of the Industrial Company for alteration and testing until August 15, 1907, when the car and equipment were again shipped to the Detroit Company, and finally refused by the Detroit Company on October 28, 1907. It also appears that the Huntingdon Bank, on January 17, 1908, after the filing of the petition in bankruptcy, obtained possession of the car with its equipment upon a writ of replevin, and upon the filing of its bond in that action in the courts of Michigan.

It also appears from the agreement of facts that the American Car Company of St. Louis intervened in the replevin proceedings and claims to be the owner of the car apart from the equipment, by virtue of the following state of facts: The Industrial Iron Company, on September 4, 1906, by its letter requested the American Car & Foundry Company to build it a steel flat car therein described; these words being found in the order: "Price. Eleven hundred sixty ($1,160.00) dollars, f. o. b. cars, Detroit, Mich." That the order was accepted by the American Car & Foundry Company, the car constructed, and on March 13, 1907, shipped from the car company's plant at Detroit, consigned to the Industrial Company at Reynoldsville, Jefferson county, Pa. And that upon the same day an invoice in triplicate was made by the car company, which contains these words, among others: "Title to property in this invoice reserved in car company until full payment made." "Terms, cash." And upon March 22, 1907, mailed one of the invoices, with a letter, to the Industrial Iron Works. The Industrial Iron Works obtained possession of the car at Reynoldsville

without paying the price agreed upon therefor, to wit, $1,160, or any part thereof, and that the whole is still unpaid and owing by the Pittsburgh Industrial Iron Works to the American Car & Foundry Company.

It also appears from the agreement of facts that, after the delivery of the car to the Industrial Company, that company equipped the car with boilers, engines, and derrick, which was substantially completed on April 3, 1907. It also appears that the American Car & Foundry Company did not consent or in any way sanction the transaction between the Industrial Company and the National Bank of Huntingdon.

It appears from the record that a petition in involuntary bankruptcy was filed against the Pittsburgh Industrial Iron Works on November 9, 1907, and on November 14, 1907, J. M. Stoner, Jr., was appointed receiver of the estate.

Under this agreement of facts and the stipulation of counsel for these parties the court is asked to determine the following questions. What the rights of the several parties are: First, as to the car; second, as to the equipment thereof; third, as to each other; and, fourth, as to the estate of the bankrupt?

First, as to the car: The contract was made in Michigan, and the car was to be delivered f. o. b. cars at Detroit. The delivery was complete at Detroit. In Brown v. Hare, 3 H. & N. 484, Pollock, C. B., speaking for the court, said:

"In many mercantile contracts it is stipulated that the seller shall deliver the goods 'f. o. b.' The meaning of these words is that the seller is to put the goods on board at his own expense or on account of the person for whom they are shipped and the goods are at the risk of the buyer from the time they are so on board."

The general rule of contracts is that the law of the place where the delivery is to be made or performed must control. Benjamin on Sales (5th Ed.) 682; Phila. Ry. Co. v. Wireman, 88 Pa. 264; Johnson v. Stoddard, 100 Mass. 306.

In general, when goods are left with a carrier, in the absence of a stipulation, the title vests in the vendee upon delivery to the carrier. Schmertz v. Dwyer, 53 Pa. 335; Garbracht v. Commonwealth, 96 Pa. 449, 42 Am. Rep. 550; Carlisle & Finch Co. v. Sand Co., 20 Pa. Super. Ct. 378. It thus appears that the contract having been made by the vendor in the city of Detroit, and the goods having been delivered to the carrier f. o. b. cars Detroit, and consigned to the vendee, the law of the state of Michigan must govern the contract. Hartford Insurance Co. v. Railway, 175 U. S. 91, 20 Sup. Ct. 33, 44 L. Ed. 84.

Under this contract, then, governed by the law of the state of Michigan, may the American Car & Foundry Company claim title against the Pittsburgh Industrial Iron Works? It appears, as we have seen, that the Industrial Iron Works, by its letter of September 4th, ordered the car from the American Car & Foundry Company, at the price of $1,160, f. o. b. cars, Detroit, Mich. So far as the record shows, this was the whole contract. The car company accepted the contract, and on March 13, 1907, as shown by its invoice, delivered the car f. o. b. its works, Peninsular Plant; the invoice showing terms cash, and

"title to the property in this invoice reserved in car company until full payment made."

There is nothing in the contract to show that the title to the car was reserved, unless the words in the contract, "Price eleven hundred sixty ($1,160.00) dollars, f. o. b. cars, Detroit, Mich.," are to be construed as meaning cash on delivery of car at Detroit to the carrier, and unless it follows from this inference that a sale for cash on delivery is a conditional sale; the title remaining in the vendor as against the vendee.

It is a familiar principle of law that, unless time is stipulated in a contract of sale, the sale is for cash. Benjamin on Sales, 320, note "d"; Ency. of Law (2d Ed.) vol. 6, p. 457, and cases in note; Whitcomb v. Whitney, 24 Mich. 486.

It is also an established principle of the law that, when goods are sold to be paid for in cash upon delivery, such payment is a condition precedent, and until it is made or waived no title passes to the vendee. Ency. of Law, vol. 6, p. 456; Benj. on Sales, 320, note "d"; Harkness v. Russell, 118 U. S. 663, 7 Sup. Ct. 51, 30 L. Ed. 285; Beardsley v. Beardsley, 138 U. S. 262, 11 Sup. Ct. 318, 34 L. Ed. 928; Segrist v. Crabtree, 131 U. S. 287, 9 Sup. Ct. 687, 33 L. Ed. 125; Davison v. Davis, 125 U. S. 90, 8 Sup. Ct. 825, 31 L. Ed. 635; Couse v. Tregent, 11 Mich. 65, and the cases cited in Pettyplace v. Mfg. Co., 103 Mich. 155, 61 N. W. 266.

We must therefore determine from the facts as stipulated in this case whether the sale was for cash. The order which the Pittsburgh Industrial Iron Works sent to the American Car & Foundry Company, as set out in the twelfth stipulation of fact, shows that the price was to be $1,160, f. o. b. cars, Detroit, Mich. There is nothing to show that any time for payment in the future was contemplated, and the price, $1,160, f. o. b. cars, Detroit, Mich., easily and convincingly bears the interpretation that the price was to be paid on delivery of the goods sold to the carrier at Detroit. This is strengthened by the conduct of the vendor when the car was delivered to the carrier at Detroit, for at that time, March 13, 1907, they made the invoice in triplicate, one of which was mailed to the vendee, which invoice contains the words, as we have seen, "terms cash," and "title to the property in this invoice reserved in car company until full payment made." So we have not only the price stated payable at Detroit, the point of shipment, but that price stated to be cash at the time of delivery to the carrier, and title reserved until full payment is made. This, we think, shows conclusively that the sale was for cash, that the car was delivered with the express condition that the terms were cash, and that title would remain in the car company until the price was paid.

In our opinion the cases above referred to make the sale a conditional one, which under the law of Michigan, and under the decisions in the United States courts, left the title to the car in the vendor. This being true, the title never passed to the Pittsburgh Industrial Iron Works, the vendee. It necessarily follows that the trustee in bankruptcy could only take such title as the bankrupt had. He has no greater rights than the bankrupt. York v. Cassell, 201 U. S. 344, 26

Sup. Ct. 481, 50 L. Ed. 782; Security Warehousing Co. v. Hand, 206 U. S. 415, 27 Sup. Ct. 720, 51 L. Ed. 1117; Hewit v. Berlin Machine Works, 194 U. S. 296, 24 Sup. Ct. 690, 48 L. Ed. 986.

While, therefore, the title to this property remains in the car company, so far as the bankrupt or his trustee is concerned, the question arises whether or not the First National Bank of Huntingdon, standing in the relation of an innocent third party, is entitled to have the car by virtue of its alleged assignment or pledge contained in Exhibit B attached to the petition.

As the title to the car never passed from the vendor, we are of opinion, under the law of Michigan, that the First National Bank of Huntingdon acquired no right superior to the vendor, and any rights he may have must be subject to the claims of the vendor. Pettyplace v. Mfg. Co., 103 Mich. 153, 61 N. W. 266, and cases there cited.

The First National Bank of Huntingdon, not only claims the car, but also its equipment by virtue of an alleged assignment or pledge of the car and its equipment to it, and we must now decide whether the First National Bank of Huntingdon may claim the car and equipment after satisfying the claim of the American Car & Foundry Company.

The contract of pledge, having been made by the parties in Pennsylvania, must be decided by the law of that state. Security Warehousing Co. v. Hand, 206 U. S. 415, 27 Sup. Ct. 720, 51 L. Ed. 1117; Hartford Ins. Co. v. Railway, 175 U. S. 91, 20 Sup. Ct. 33, 44 L. Ed. 84.

It appears from the agreement of facts in this case that the First National Bank of Huntingdon, on March 5, 1907, and more than four months before the filing of the petition in bankruptcy, which was filed on November 9, 1907, discounted for the Pittsburgh Industrial Iron Works, the bankrupt, its collateral promissory note for $5,125, and the same day paid to the bankrupt the sum of $5,125, taking at the same time the following writing:

Number D–5.                                    Dated Dec. 31st, 1906.
                                               Due Date: Jan. 31st, 1907.
                                               Net. Amount: $5,125.00.

Pittsburgh, Penna.

This certifies that the Detroit River Tunnel Co., of Detroit, Michigan, is indebted to Pittsburg Industrial Iron Works, Pittsburg, Pa., for goods sold and delivered as stated below:

Shipped via P. R. R.                          Terms, 30 days.

To Mdse. as per invoice of this date hereto attached and made a part hereof.

The Pittsburg Industrial Iron Works, Pittsburg, Pa., sold to Detroit River Tunnel Company, Dec. 31, 06. Terms, 30 days.

1 structural steel travelling derrick mounted on type P. M. steel flat car with 8½x10 D. C. 3 drum. Hoisting Engine, traction gear and ¾ yd. Hayward Orange Peel Bucket Complete according to contract ...................................................................$5,125.00

Know all men by these presents, that we, Pittsburg Industrial Iron Works for value received have bargained, sold, assigned, transferred and set over and by these presents do bargain, sell, assign, transfer and set over unto the First National Bank of Huntingdon, Pa., its successors and assigns, the claim or account set forth or described in the above statement, and the goods covered by or described therein, and all moneys due or to grow due upon the same or sales therein set forth, and the sole right to collect the same, and we hereby constitute and appoint the said the First National Bank of Hunting-

don, Pa., our true and lawful attorney, irrevocably for us and in our name and stead, but to its own use and benefit, to sell, assign, transfer, set over, compromise or discharge the whole or any part of the aforesaid claim or account, and for that purpose to do all acts and things necessary or proper in the premises, and one or more persons to substitute with like power hereby ratifying and confirming all that our said attorney or its substitutes shall lawfully do by virtue hereof.

We hereby guarantee and certify that this amount so assigned is bona fide sale and a correct account for goods actually sold and delivered and accepted, and that there is no set-off or counterclaim of any kind thereto, and we agree that any claim or deductions allowed will be refunded by us by allowing the same to be deducted from future advances or by payment of the amount of such deductions in cash at the option of the First National Bank of Huntingdon, Pa., and that any invoices or bills rendered by us for this account shall have the statement upon their face that they are payable only to the bank of deposit designated by the First National Bank of Huntingdon, Pa.

We hereby guarantee payment in full of the above account.

In witness whereof, we have hereunto set our hands and seals this fifth day of March, 1907.                    Pittsburg Industrial Iron Works,
                                              By C. F. Dickinson, President.

$5,125.00                              Pittsburg, Penn'a, Sept. 23, 1907.

Sixty days after date, for value received, we promise to pay to the order of the First National Bank of Huntingdon, Pa., fifty one hundred twenty-five and no/100 Dollars, with interest at the rate of 6 per cent. per annum, having deposited herewith as collateral security for payment of this or any other liability or liabilities of ours to the holder hereof, now due or to become due, or that may be hereafter contracted, the following property, viz.: Account #D-5 against the Detroit River Tunnel Co., Detroit, Michigan—the market value of which is now $5,125.00, with the further right to call for additional security in case there should be a decline in the market value thereof, and on failure to respond, this obligation shall be deemed to be due and payable without demand or notice, with full power and authority to the holder hereof to sell and assign and deliver the whole of the above mentioned security, or any part thereof, or any substitute thereof or any additions thereto, at any Brokers Board, or at public or private sale, at the option of the holder hereof on the nonperformance of this promise, or the nonpayment of any of the liabilities above mentioned, at any time or times hereafter, without demand, advertisement or notice, and with the right to purchase as any other bidder at any public sale thereof, held by virtue hereof. And after deducting all legal and other costs and expenses for collection, sale and delivery, to, apply the residue of the proceeds of such sale or sales so to be made, to pay any, either or all of said above mentioned liabilities, as the holder hereof shall deem proper, returning the overplus to the undersigned.

Payable at The First National Bank, Huntingdon, Pa.
                                       Pittsburg Industrial Iron Works,
                                       C. F. Dickinson, President,
                                       J. S. Beckwith, Treas.

On March 6, 1907, the bankrupt notified the Detroit River Tunnel Company as follows:

                                                      Mar. 6, 1907.

Detroit River Tunnel Co., Detroit, Mich.—Gentlemen: For financial convenience we have arranged with the First National Bank, Huntingdon, Pa., to cash the invoice mailed to you, amounting to $5,125.00. Kindly make remittances to them. You understand your compliance incurs no liability whatever, you simply settle with bank instead of us.

We also inclose you form of reply, which please mail to them in stamped envelope herewith.

Thanking you in advance for the courtesy, we are,
      Yours truly,                                   President.

And the Detroit Company wrote the bank the following letter:

Detroit, Mich., March 20th, 1907.

First National Bank, Huntingdon, Pa.—Gentlemen: We have received a letter from the Pittsburg Industrial Iron Works, dated March 6th, and asking us to pay you what may be due them for a derrick car which they have been building for us. After the car has been received, tested and accepted, we will pay you whatever may be due them for it.

Yours truly,  Benjamin Douglas.

On April 3, 1907, the car with its equipment was tendered to the Detroit Company by the bankrupt company and refused as not being in accordance with the specifications, and on May 17, 1907, the same was returned to the bankrupt and was in the possession of the bankrupt from May 17, 1907, until August 15, 1907, for alteration and testing, to make it conform to the contract, and on August 17, 1907, the car with its equipment was again tendered to the Detroit Company, and again refused as not being according to the contract, and the bankrupt again attempted to change it to meet the requirements of the contract, and the same was finally refused by the Detroit Company on October 28, 1907, by notice from the Detroit Company to the bankrupt.

The car at this time was in Detroit in the custody of the carrier who had carried it for delivery to the Detroit Company. The car with its equipment was there, on January 17, 1908, seized in an action of replevin upon the filing of a bond by the First National Bank of Huntingdon, and still remains in the custody of that bank by virtue of that pending proceeding.

It clearly was intended by the alleged assignment and collateral note to assign and transfer to the bank the account or money arising from the sale by the bankrupt to the Detroit Company of the car and its equipment. It was for the identical amount of the contract made by the bankrupt with the Detroit Company. It is recited in the alleged assignment that the car and its equipment had been sold and delivered to and accepted by the Detroit Company, and the transaction between the bank and the bankrupt shows on its face that it was the discounting or purchasing of the account for a present consideration of $5,125 then and there paid by the bankrupt.

But this assignment also, after reciting the assignment of the account, had these words, "and the goods covered by or described therein," which would be a good pledge of the car and its equipment between the pledgor and pledgee, and the question we are confronted with is whether, under the law of Pennsylvania, the place of the contract, this was a valid sale or pledge of the car and equipment, as to the trustee in bankruptcy, and, if not valid as a pledge, can the equities of the bank in the car and its equipment be preserved as an equitable lien?

The Supreme Court of Pennsylvania has often been called on to pass upon these questions. In Clow v. Woods, 5 Serg. & R. 275, 9 Am. Dec. 346, that court, speaking by Justices Gibson and Duncan, decided that a sale or pledge of goods and possession retained by the vendor or pledgor was a fraud per se. But while that case is said, in McKibbin v. Martin, 64 Pa. 352, 3 Am. Rep. 588, to be the magna charta of Pennsylvania on the subject of actual and legal fraud in the transfer

o

of chattels, both Judge Gibson and Judge Duncan recognized that there might be exceptions to the rule, for it is there said by Judge Gibson:

"The inclination of my mind is, to give the statute a liberal, perhaps an enlarged construction, by putting the rule requiring a change of possession, on grounds of public policy, and confining its exceptions to those cases, where, from the very nature of the transaction, possession either could not be delivered at all, or, at least, without defeating fair and honest objects, intended to be effected by and which constituted the motive for entering into, the contract. Where possession has been withheld pursuant to the terms of the agreement, some good reason for the arrangement, beyond the convenience of the parties, should appear."

And in the same case Judge Duncan, in a concurring opinion, says:

"It therefore appears to me that by the principles of the common law, and the settled construction of the statutes of Elizabeth, to a mortgage of chattels, delivery is necessary; that every such mortgage, when the parties stand in the relation of debtor and creditor, unaccompanied with such possession as the subject-matter is capable of, is fraudulent and void against all other creditors, whether the debts were contracted antecedently or subsequently to the mortgage."

In McKibbin v. Martin, supra, we find that the court recognized that there were exceptions to the rule, for it is there said by Mr. Justice Sharswood:

"Whenever the subject of the sale is capable of an actual delivery, such delivery must accompany and follow the sale to render it valid against creditors. The court is the tribunal to judge whether there is sufficient evidence to justify the inference of such a delivery. If there is any question upon the evidence as to the facts, or resting upon the credibility of witnesses, the determination of that must be referred of course to the jury. But, if not, it is incumbent upon the court to decide it, either by a judgment of nonsuit or a binding direction in the charge. Young v. McClure, 2 Watts & S. 147; McBride v. McClelland, 6 Watts & S. 94; Milne v. Henry, 4 Wright, 352; Dewart v. Clement, 12 Wright, 413. But it often happens that the subject of the sale is not reasonably capable of an actual delivery, and then a constructive delivery will be sufficient. As in the case of a vessel at sea, of goods in a warehouse, of a kiln of bricks, of a pile of squared timber in the woods, of goods in the possession of a factor or bailee, of a raft of lumber, of articles in the process of manufacture, where it would be not indeed impossible, but injurious and unusual to remove the property from where it happens to be at the time of the transfer. Clow v. Woods, 5 Serg. & R. 275 [9 Am. Dec. 346]; Cadbury v. Nolen, 5 Barr. 320; Linton v. Butz, 7 Barr, 89 [47 Am. Dec. 501]; Haynes v. Hunsicker, 2 Casey, 58; Chase v. Ralston, 6 Casey, 539; Barr v. Reitz, 3 P. F. Smith, 256; Benford v. Schell, 5 P. F. Smith, 393. In such case it is only necessary that the vendee should assume the control of the subject so as reasonably to indicate to all concerned the fact of the change of ownership."

In Keystone Watch Case Co. v. Bank, 194 Pa. 535, 45 Atl. 328, Mr. Justice Dean, in commenting upon the case of Clow v. Woods, supra, says:

"In the 80 years that have elapsed since the decision of Clow v. Woods, 5 Serg. & R. 275 [9 Am. Dec. 346], the rigor of the rule laid down in that case, and it is the leading one in this state, has been greatly relaxed; nor, considering the progress in population and wealth, and the change in methods of conducting business, could it have been strictly adhered to, without great obstruction to business and hardship to individuals. Under that ruling the cases were rare, where, as to creditors, the ownership of chattels could be in one and the possession in another. In such circumstances, with few exceptions, the transaction was constructively fraudulent as to creditors. But.

in the long line of cases following it, step by step, the rule has been so softened that now, it may be said, with few exceptions, where the purpose of the contracting parties was, as between themselves, an honest one, and there was no concealment as to creditors of its true nature, the contract is not constructively fraudulent; in other words, the law will be slow to hold the parties scamps, constructively, if the contract, in view of its purpose, was actually an honest one."

It is said by Mr. Justice Fell in the case of Sholes v. Asphalt Company, 183 Pa. 528, 38 Atl. 1029:

"The rule is that delivery is essential to the contract of pledge. It is true that the rule has been relaxed in cases where, because of the nature of the thing pledged or for other reasons, the requirement of delivery would be such a hardship as to defeat the purpose of the contract; but the policy of the law is against such relaxation, and it has been mainly confined to cases in which the goods have remained in the possession of the pledgor as agent of the pledgee under an express agreement to that effect."

In the case at bar the car with its equipment was in process of manufacture by the Pittsburgh Industrial Iron Works and was being manufactured under a contract of sale to the Detroit River Tunnel Company. The possession was necessarily retained by the Industrial Company, so that the chattels sold might be manufactured, and actual possession could not be delivered to the bank. Also, there had been an actual bargain for the sale of the car and its equipment to the Detroit Company, and that company as the vendee was entitled to possession when completed. This also prevented actual possession by the bank.

Under the Pennsylvania cases, therefore, and the facts of this case, the pledge of the car with its equipment was not fraudulent per se, for an honest and good reason existed for not delivering the possession to the pledgee.

But this case may fall under a different principle and one which arises out of the exception to the doctrine of fraudulent sales. Taking the whole transaction into consideration, it appears that the intention of the Industrial Company and the bank was that the goods described in the certificate were sold to the bank, it to receive the price to be paid by the Detroit Company, if that sale was completed, otherwise to have the goods described. Upon failure of the sale to the Detroit Company the goods would come into the possession of the vendor, but only as representing the pledgee. It was only as though they were in the hands of a bailee, and the bank would have the right to take possession of them. The case would therefore come under the principle of Caulfield v. Van Brunt, 173 Pa. 428, 34 Atl. 230, and Linton v. Butz, 7 Pa. 89, 47 Am. Dec. 501. The goods were finally refused by the Detroit Company on October 28, 1907, remaining in the custody of the railroad company. They never came into the actual possession of the bankrupt, but remained in the hands of the carrier charged with the delivery to the Detroit Company. The trustee never had possession of them; they remaining in the custody of the railroad company, charged, as we have said, with the delivery of them to the Detroit Company. Although the petition in bankruptcy was filed on November 7, 1907, the trustee did not take possession, and the bank

took them in January, 1908, by its writ of replevin from the railroad company, and thus gained possession under its assignment or sale.

But may not the claim of the bank be sustained as an equitable lien? As said by Judge Archbald in the case of Fourth St. Nat. Bank v. Millbourne Mills Co., 172 Fed. 177, 96 C. C. A. 629:

"This is not to say that an equitable lien, under some circumstances, may not exist; but only that there is nothing to support it here. It never arises or is enforced except against property in the hands of a party to the original transaction out of which it is claimed to grow, or his voluntary representatives, or one who has notice of it and is affected with it as a superior right, within which all the cases cited in support of it will be found to fall."

And again, in speaking of Hurley v. Railroad, 213 U. S. 126, 29 Sup. Ct. 466, 53 L. Ed. 729, the same learned judge said:

"True, an equitable right or lien was there recognized as against a trustee in bankruptcy, but upon materially different facts. The railroad there, in whose favor it was held to exist, was a party to the tripartite agreement by which the bankrupt acquired the right to mine the coal against which it was enforced, which he agreed to mine and deliver to the railroad at a certain price; the railroad on failure to comply having the right to enter and avoid the lease. It was with these relations to the property that the railroad, anticipating its payments, advanced money to the bankrupt for coal not yet mined, in order to enable the company to go on with its mining business; and it was in return for this that the delivery of a certain amount of coal was claimed and allowed. The transaction, as it was said, was not one of ordinary borrowing and lending on credit or security, but constituted, from an equitable standpoint, a pledge or hypothecation of the unmined coal to the extent of the advancements made, with which, in view of the reciprocal rights and relations of the parties, the trustee, equally with the bankrupt, was bound to comply."

The facts in the case at bar are quite as strong as the facts in the case of Hurley v. Railroad. The car and its equipment were in process of manufacture. To enable the bankrupt to proceed with its manufacture and comply with its contract of sale to the Detroit River Tunnel Company, the bank advanced the full price of the contract to the bankrupt; notice being given to the vendee by the bank and accepted by the vendee, the money advanced thus taking the place among the assets of the bankrupt of the car and its equipment. From that time until October 28, 1907, a few days before the filing of the petition, the bankrupt was endeavoring to comply with its contract and to satisfy the requirements of the Detroit River Tunnel Company, and the bank could not both by reason of the goods being in the hands of the manufacturer and in process of manufacture, and because the car had already been contracted for to be delivered to the Detroit Company, take possession of the chattels upon which it had advanced the money. It had the right to take that possession as soon as the Detroit Company refused to take the property. We have seen that its assignment entitled it to take possession of it. We have found that it did take possession of it before it ever actually came into the possession of the bankrupt or its trustee. Can it not be said, as was said of Hurley v. Railroad in Fourth St. Nat. Bank v. Millbourne Mills Co., supra:

"The transaction, as it was said, was not one of ordinary borrowing and lending on credit or security, but constituted, from an equitable standpoint, a pledge or hypothecation of the unmined coal to the extent of the advance-

ments made, with which, in view of the reciprocal rights and relations of the parties, the trustee, equally with the bankrupt, was bound to comply."

Nor does the decision that the bank's equities in this case may be construed to give it an equitable lien offend against the decision in Fourth St. Nat. Bank v. Millbourne Mills Co., supra, where it is said:

"It leaves no place, in our judgment, for the idea, which is now advanced, that any such claim can be asserted as to personal property ineffectually pledged to the detriment of general creditors acting through a trustee in bankruptcy or other representative taking title in their interest by operation of law."

In no sense was this transaction to the detriment of the creditors. The full cost of the manufacture and the added profits were presumably included in the contract price, and this amount was paid by the bank to the bankrupt and passed into its assets long before the contract was completed. It is only by straining the principle to the breaking point to say that, under the circumstances of this case, it was not a good pledge. It is only by disregarding the facts of this case that we can say that the possession of the bankrupt was a possession in its own right and not a possession as agent, representative, or factor, charged with the manufacture of the chattels in dispute, for the bank, because it clearly appears that the car and equipment were sold to the bank by the bankrupt, to be manufactured and delivered to the Detroit Company in accordance with its contract with that company.

The doctrine of equitable lien is not a new one. It is stated by Pomeroy's Equity, § 1235, as follows:

"The doctrine may be stated in its most general form that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund therein described or identified, a security for a debt or other obligation, * * * creates an equitable lien upon the property so indicated, which is enforceable. * * * In order, however, that a lien may arise in pursuance of this doctrine, the agreement must deal with some particular property, either by identifying it, or by so describing it that it can be identified, and must indicate with sufficient clearness and intent that the property so described or rendered capable of identification is to be held, given, or transferred as security for the obligation."

It has been recognized in Pennsylvania. Collins' Appeal, 107 Pa. 605, 52 Am. Rep. 479.

This lien, having been acquired more than four months before the filing of the petition, would not be affected by the bankrupt act.

We are therefore of the opinion that, as to the car, the American Car & Foundry Company is entitled to have the car, or in lieu thereof the sum of $1,160, from the First National Bank of Huntingdon, and that upon the payment of that sum the First National Bank of Huntingdon may retain the car and its equipment.

Let an order be drawn accordingly.